**No. 24-2774**

_____

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE EIGHTH CIRCUIT**

_____

**UNITED STATES OF AMERICA,**

**APPELLEE,**

**v.**

**SHUE MOUA,**

**APPELLANT**.

_____

*Appeal from the United States District Court, District of Minnesota*
*Hon. John R. Tunheim*
*No. 23-cr-179 (JRT/LIB)*

_____

**APPELLANT'S BRIEF**

_____

Robert A. Lengeling
Law Office of Robert A. Lengeling, PLLC
MN ID#304165
310 Fourth Ave S, Suite 1050
Minneapolis, Minnesota 55415
(612) 963-1555 / (612) 333-8003 fax
ATTORNEY FOR APPELLANT

## SUMMARY OF THE CASE

The Appellant, Shue Moua, appeals the final Judgment entered in her case on August 27, 2024. (R. Doc. 102; ADD 38). More specifically, Moua appeals the Memorandum Opinion and Order Rejecting the Report and Recommendation of the Magistrate Judge. (R. Doc. 49; ADD 26).

Moua moved to suppress evidence based on an unlawful traffic stop and subsequent search and seizure. The Magistrate Judge recommended granting the motion to suppress. The Government objected to the Magistrate Judge's Report and Recommendation. On December 21, 2023 the Hon. John R. Tunheim issued a memorandum opinion rejecting the Magistrate's recommendation to suppress.

Moua tried her case to a jury since there was not a conditional plea agreement. She was convicted and Judge Tunheim sentenced her to 72 months in prison followed by four years of supervised release. She appeals the denial of her motion to suppress and seeks to vacate her conviction.

Since this appeal involves nonfrivolous issues and because oral argument will aid the Court in the determination of this appeal, Moua respectfully requests oral argument.

Counsel requests 10 minutes of oral argument per side.

Appellate Case: 24-2774    Page: 2    Date Filed: 10/09/2024 Entry ID: 5444690

# TABLE OF CONTENTS

Summary of the Case   ……………………………………………   2

Table of Authorities   ……………………………………………   4

Jurisdictional Statement   ……………………………………………   6

Statement of Issues   ……………………………………………   7

Statement of the Case   ……………………………………………   8

Summary of Argument   ……………………………………………   16

Argument   ……………………………………………   17

Conclusion   ……………………………………………   27

Certificate of Compliance……………………………………………   28

Appellate Case: 24-2774   Page: 3   Date Filed: 10/09/2024 Entry ID: 5444690

# TABLE OF AUTHORITIES

CASES

*Heien v. North Carolina*, 574 U.S. 54 (2014) …………………………… 23

*Ornelas v. United States*, 517 U.S. 690 (1996) ………………………… 17

*Reid v. Georgia*, 448 U.S. 438 (1980) ……………………………….. 21

*Rodriguez v. United States*, 575 U.S. 348 (2015) ……………………….. 22

*Terry v. Ohio*, 392 U.S. 1 (1968) ……………………………………… 19

*United States v. Arvizu*, 534 U.S. 266 (2002) ……………………….. 18

*United States v. Bueno*, 443 F.3d 1017 (8th Cir. 2006) ……………..… 23

*United States v. Callison*, 2 F.4th 1128 (8th Cir. 2021)…………………… 21

*United States v. Carrate*, 122 F.3d 666 (8th Cir. 1997) …………………… 23

*United States v. Condelee*, 915 F.2d 1206 (8th Cir. 1990)………………… 20-21

*United States v. Cortez*, 449 U.S. 411 (1981) ……………………….. 18

*United States v. Evans*, 4 F.4th 633 (8th Cir. 2021) ……………………… 17

*United States v. Foster*, 15 F.4th 874 (8th Cir. 2021) ……………………. 19

*United States v. Givens*, 763 F.3d 987 (8th Cir. 2014) …………………… 25

*United States v. Hanel*, 993 F.3d 540 (8th Cir. 2021) …………………… 19

*United States v. Hollins*, 685 F.3d 703 (8th Cir. 2012) ………………….. 18

*United States v. Jones*, 269 F.3d 919 (8th Cir. 2001) …………………… 22

*United States v. Jones*, 606 F.3d 964 (8th Cir. 2010) …………………… 18

Appellate Case: 24-2774    Page: 4    Date Filed: 10/09/2024 Entry ID: 5444690

*United States v. McLemore*, 887 F.3d 861 (8th Cir. 2018) ……………… 24,25

*United States v. Mendoza*, 691 F.3d 954 (8th Cir. 2012) ……………… 24,25

*United States v. Morris*, 915 F.3d 552 (8th Cir. 2019) ………………… 17

*United States v. Washington*, 455 F.3d 824 (8th Cir. 2006) …………….. 17

*United States v. Wilson*, 205 F.3d 720 (4th Cir. 2000) ………………… 24

## STATUTES/RULES

18 U.S.C. §3231          ……………………………………… 6

21 U.S.C. §841 (b)(1)(B)  ……………………………………… 6

28 U.S.C. §1291          ……………………………………… 6


U.S. Constitution, Amend. IV  …………………………….. 18

Appellate Case: 24-2774    Page: 5    Date Filed: 10/09/2024 Entry ID: 5444690

## JURISDICTIONAL STATEMENT

The Appellant, Shue Moua, was indicted on May 4, 2023. The Indictment charged one count of possession with intent to distribute methamphetamine in violation of 21 U.S.C. §841(b)(1)(B). (R. Doc 15). Moua moved to suppress evidence from an unlawful search and seizure. (R. Doc. 22). A hearing was held on July 6, 2023 before the Hon. Leo I. Brisbois. (R. Doc. 32). Judge Brisbois issued a Report and Recommendation ("R & R") on October 12, 2023 recommending the motion to suppress be granted. (R. Doc. 45; ADD 1). The Government objected to the R & R on October 26, 2023. (R.Doc. 46). On December 21, 2023 the Hon. John R. Tunheim issued a Memorandum Opinion and Order Rejecting Report and Recommendation and Denying Motion to Suppress. (R. Doc. 49; ADD 26).

The case went to trial on April 8, 2024. The jury returned a guilty verdict on April 10, 2024. (R. Doc. 83). Judge Tunheim sentenced Moua on August 20, 2024 to 72 months in prison followed by four years of supervised release. (R. Doc. 101). The Judgment was entered on August 27, 2024. (R. Doc. 102; ADD 38). Moua timely filed her notice of appeal on August 28, 2024. (R.Doc. 106).

The District Court had jurisdiction over this case pursuant to 18 U.S.C. §3231.The 8th Circuit Court of Appeals has jurisdiction of the appeal pursuant to 28 U.S.C. §1291. This is an appeal from a final judgment of a district court of the United States.

Appellate Case: 24-2774    Page: 6    Date Filed: 10/09/2024 Entry ID: 5444690

## STATEMENT OF ISSUES

**I.  THE DISTRICT COURT ERRED BY REJECTING THE REPORT AND RECOMMENDATION OF THE MAGISTRATE AND DENYING MOUA'S MOTION TO SUPPRESS.**

Apposite cases:

*United States v. McLemore*, 887 F.3d 861 (8th Cir. 2018)

*United States v. Callison*, 2 F.4th 1128 (8th Cir. 2021)

Appellate Case: 24-2774    Page: 7    Date Filed: 10/09/2024 Entry ID: 5444690

## STATEMENT OF THE CASE

A hearing on Moua's motion to suppress was held on July 6, 2023 before the Hon. Leo I. Brisbois. The R & R contains a detailed statement of facts that neither party objected to in terms of accuracy. Moua submits the following factual summary and will cite to the transcript of the suppression hearing as "TR" since this transcript presents the primary issue on appeal. The trial transcript was also prepared and filed, and will be referred to as "TTR" with the volume number.

During the hearing, the Government called Carlton County Sheriff Deputy Nils Hansen and offered several exhibits. Direct examination revealed on March 2, 2023 Dep. Hansen was working a night shift patrol. TR 13. At the time, Dep. Hansen was a K9 officer and had his canine partner with him in his patrol vehicle. TR 8-9, 70. The weather on March 2, 2023 was cold and temperatures were around 10 degrees. TR 70. At approximately 1:40 am, Hansen entered the parking lot of the Kwik Trip on Highway 210 in Carlton, Minnesota. TR 13. He was in a fully marked Dodge Ram pickup truck. TR 14. Hansen slowly drove through the lot and parked to the right of the entrance doors. TR 16. The deputy observed one vehicle parked at the gas pumps. TR 17. He claimed to immediately observe the vehicle had no front mounted registration or license plates. TR 17. The deputy had a full view of the front of the vehicle. TR 18. He was positioned about 30 feet away or less, perpendicular to the vehicle. TR 72.

8

Dep. Hansen remained in his vehicle and watched the driver of the vehicle at the gas pumps. He claimed the driver was unbalanced and stumbled while walking around the front of the vehicle. TR 18. The parking lot had snow on the ground and some icy spots. TR 71; *see* Gov't Ex. 1. Hansen decided to continue watching the vehicle to see if there was a rear-mounted registration or license plate. TR 20. The driver then repositioned the vehicle at the gas pumps because the vehicle was parked with the gas opening on the wrong side. TR 20. Hansen claimed he found it strange that the driver executed the turn by making a series of short, choppy motions instead of a fluid circle around to a different pump. TR 20. Hansen did not elaborate on why that driving conduct was suspicious.

After the vehicle was turned around, it was parked at the same gas pump with the rear of the vehicle now facing toward Dep. Hansen's position. TR 23. He had a clear view of the vehicle. TR 74 Hansen claimed he could not see any rear-mounted registration. TR 23. However, the Government pointed out by zooming in to Gov't Exhibit 1, p. 1, that the vehicle had a document visible in the rear window. TR 24. Hansen also stated the window was partially frosted over. TR 23. On cross examination, Hansen admitted the back of his squad vehicle and the other vehicle both had snow covering the license plate area, making it difficult to see license plates. TR 74-75. The alleged lack of registration caused Hansen

9

concern. TR 25. Hansen stated his primary concern was the driver was possibly impaired. TR 25-26.

Rather than approach the vehicle, Dep. Hansen stated he drove out of the gas station lot and parked in an adjacent parking lot to continue watching the vehicle. TR 26. He admitted on cross examination he could have approached the vehicle, but instead he allowed a person he suspected of being impaired to drive away. TR 76. Hansen followed when the vehicle drove out of the gas station and proceeded westbound on Highway 210. TR 26. He followed the vehicle onto southbound I35. TR 26. Hansen testified he followed the vehicle to build on his impaired driving investigation and because he claimed the vehicle did not have visible registration. TR 27. He claimed he lost sight of the vehicle for about two miles, but was able to catch up to it on I35. TR 27. Hansen identified the vehicle he caught up to and claimed he still could not see registration or license plates. TR 28. Hansen claimed he followed the vehicle for about four or five miles after catching up to it. TR 29.

Dep. Hansen had his squad vehicle camera recording, which was received as Gov't Exhibit 4A. He testified the vehicle he followed was traveling about 55 mph and he described the vehicle as not maintaining a consistent position in the lane. TR 29-30. The speed limit on I35 is 70 mph and the minimum speed is 40 mph. TR 31. Hansen stated he found the road to be safely passable at higher speeds. TR

31. He also admitted there was snow on the road and tire tracks. TR 80. The deputy was in a four-wheel-drive Dodge Ram and the suspect vehicle was a four-door sedan. TR 80. Hansen admitted on cross examination that Moua's speed alone was not a problem given the road conditions. TR 81.

Ultimately, Dep. Hansen determined he thought the vehicle driver may be impaired and he initiated a traffic stop. TR 32. The stop took place around mile marker 226 on I35, which is about 9 miles from the Kwik Trip. TR 77. Hansen agreed he was about four car lengths behind the vehicle when he initiated the stop and his video recorder never showed him any closer. TR 77. The vehicle began braking five seconds after Hansen activated his his lights. *see* R & R p. 13; Gov't Ex. 3 at 0:00:33. He testified the vehicle took too long in his opinion to pull over to the shoulder. TR 33. There was snow on the shoulder of the road. TR 70-71. Minnesota DOT snow plows were actively engaged in plowing the road. TR 71. In fact, a snow plow is visible ahead of the vehicle Moua was driving when Hansen initiated the stop. *see* Gov't Ex. 3, squad video (:33). A second snow plow came by just after the stop was initiated. TR 79. On cross, Hansen admitted he never saw Moua cross lane lines and all the vehicle lights were working properly. TR 82-83.

In addition to the squad video, Dep. Hansen also had a body worn camera (BWC) activated. *see* Gov't Exhibit 2. As he got out and approached the stopped vehicle, the BWC video shows the rear window with a Wisconsin registration form

Appellate Case: 24-2774    Page: 11    Date Filed: 10/09/2024 Entry ID: 5444690

taped to the inside on the lower left corner and he paused to briefly to examine it.

*see* R & R, p. 13; Gov't Ex. 3 at 0:01:27. Hansen admitted on cross exam he saw

this before having any contact with the driver. TR 78. Despite the testimony from

Hansen that the window was frost covered or iced over, the registration was visible.

*see* Gov't Ex. 5. Dep. Hansen testified he saw the registration document was printed

with the words "Wisconsin Temporary" across the top. TR 78. Further, the deputy

testified he routinely stops vehicles from Wisconsin and he is aware how Wisconsin

handles temporary registration. TR 82.

     As Dep. Hansen approached the passenger side window of the vehicle, he

could see no other people in the vehicle besides the driver. TR 40. He identified

the driver as the Defendant, Shue Moua, by her Wisconsin driver's license. TR 40.

However, the license was voided. TR 40. Moua was unable to locate insurance for

the vehicle. TR 42. The vehicle was registered to another person.

     At this point, Dep. Hansen testified about his observations of Moua as he

conversed with her through the passenger window. He stated Moua had slurred

speech and displayed what he described as bruxism. TR 43. On cross exam,

Hansen admitted he did not check to see if Moua's teeth showed signs of bruxism

such as flat teeth from grinding. TR 89. Hansen further claimed Moua's eyes were

bloodshot and her pupils were dilated even though he was shining his flashlight into

the vehicle. TR 43. However, a review of the body-worn camera footage shows the

12

driver's seat area of the vehicle was shadowed due to light shining from behind.  *see* Gov't Ex. 2. Hansen claimed he suspected Moua was impaired by a controlled substance. TR 45. On cross exam, he stated he thought Moua was taking a stimulant drug while also saying she was slurring her speech and was not manic. TR 90-91. He also indicated he observed a pepper spray canister on the keychain inside the vehicle. TR 46. In Minnesota, the pepper spray is prohibited if you have felony convictions. TR 48. However, Hansen never tested the canister to see if it worked or if it actually contained pepper spray. TR 84. Rather, he allowed the supposed pepper spray canister to remain in the vehicle within Moua's reach.

Dep. Hansen checked the VIN number of the vehicle through the front windshield to compare to the registration and then he went back to his squad vehicle. TR 48, 49. Hansen ran a license check and then looked up court records for Minnesota and Wisconsin. TR 50. Moua remained in the vehicle while Hansen conducted his records check.  This records check took several minutes.  *see* Gov't Ex. 3, squad video (~4:34 - 9:30). Hansen returned to the vehicle Moua was in and asked her to step out to conduct standard field sobriety tests (SFSTs). TR 56; Gov't Ex. 3, squad video (~10:06). He also looked through the back seat windows and noticed a make-up case with cellophane sticking out. TR 51.

After getting out of the car, Moua walked back to the area in front of Dep. Hansen's squad vehicle. *see* Gov't Ex. 3, squad video (~10:10). Hansen then had a

conversation with Moua that lasted approximately thirteen minutes while standing out in the cold weather before starting SFSTs. *see* Gov't Ex. 3, squad video (~10:10 - 23:45). Around the 19:00 mark on Gov't Ex. 3, Moua is seen smoking a cigarette while talking to Hansen. On direct examination, Hansen stated he was asking Moua about her prior convictions during this thirteen minute period. TR 53.

Finally, around 23:45 on Gov't Exhibit 3, Dep. Hansen began SFSTs with Moua. But first, Hansen testified he asked Moua for her consent to search the vehicle. TR 56. He testified he made the request because of her admission to past drug use, observation of the make-up case with cellophane, and he felt he had reasonable suspicion drugs were present in the vehicle. TR 56. He also claimed he wanted to check for other weapons. TR 56. Moua initially consented to a search. TR 56. Rather than begin the search, Hansen began the SFSTs. TR 56-57. Again, Dep. Hansen is a K9 officer and had his canine partner in his squad vehicle this entire time. TR 70. The canine was never deployed. TR 70.

Dep. Hansen testified the scope of the stop was impaired driving so he wanted to "transition into field sobriety testing" before "expanding on to other suspicions." TR 57. He stated the initial basis for the stop was impaired driving. TR 57. The SFSTs began around 23:45 on Gov't Exhibit 3 and lasted until approximately 30:00. Ultimately, Dep. Hansen believed Moua was under the influence of a controlled substance and he claimed to have reached a decision to

14

arrest her. TR 61. However, Hansen did not arrest her at that point. TR 62. The

squad video shows Hansen allow Moua to retrieve her dogs from the vehicle and

then sit in the back of a second squad vehicle that had arrived. TR 63.

According to Dep. Hansen's direct examination, he began the vehicle search

and started with the make-up case. TR 64. The case did not contain contraband.

TR 85. At that point, Moua revoked her consent for the search. TR 64; *see* Gov't

Ex. 3, squad video (~35:07). Hansen stated he then advised Moua she was being

arrested for impaired driving and possession of the pepper spray. TR 64. However,

the BWC footage in Gov't Exhibits 2 and 2A show that Dep. Hansen was still

struggling to determine what to do when Moua revoked her consent for the search.

He conversed with his colleagues and again checked if Moua had a felony

conviction before deciding how to proceed. *see* Gov't Ex. 2, 2A.

Eventually, the vehicle was impounded and a tow called. TR 65. Hansen

stated the Carlton County Sheriff Department tow policy requires an inventory of

the contents of a vehicle before being towed. TR 66. The inventory search

uncovered methamphetamine on the passenger floorboard. TR 67-68.

According to the timestamps on Gov't Exhibit 3, the traffic stop took nearly

an hour before Dep. Hansen arrested Moua and then she was held even longer as

Hansen began his inventory of the car. The search of the vehicle revealed

methamphetamine on the passenger side floorboard, which formed the basis for the charge against. R & R, p. 15; TR 67-68.

## SUMMARY OF ARGUMENT

Moua argues on appeal the Magistrate Judge was spot-on correct in his report and recommendation that the motion to suppress be granted. The District Court Judge erred by rejecting the recommendation and denying the motion to suppress. Moua argues Dep. Hansen had no lawful basis to initiate a traffic stop. She further argues the officer impermissibly extended the traffic stop, which lead to an unlawful search. The testimony of Dep. Hansen lacked credibility and the Magistrate Judge was in the best position to evaluate this testimony. Moua claims the District Court should not have supplanted the Magistrate Judge's evaluation of the hearing evidence with his own opinion without first observing Dep. Hansen testify. Moua is concerned the District Court did not conduct a proper review of the video evidence introduced during the hearing.

During the suppression hearing, Dep. Hansen claimed he stopped Moua because he was concerned she was impaired and, alternatively, he was not sure the vehicle displayed proper registration. Despite a relatively low bar, the Government failed to establish Dep. Hansen had a reasonable, articulable suspicion to stop the vehicle Moua was driving. Further, the deputy had no lawful basis to extend the traffic stop in order to manufacture a basis to search the vehicle.

16

The traffic stop was unreasonable under the Fourth Amendment, there was no lawful basis to extend the stop, and all evidence obtained from the subsequent search of the vehicle must be suppressed.

## ARGUMENT

## I.   THE DISTRICT COURT ERRED BY DENYING MOUA'S MOTION TO SUPPRESS.

<u>Standard of Review</u>

This Court reviews a denial of a motion to suppress applying a *de novo* review to questions of law and clear error review to questions of fact. *United States v. Evans*, 4 F.4th 633, 636 (8th Cir. 2021); *quoting United States v. Morris*, 915 F.3d 552, 555 (8th Cir. 2019). A district court's decisions concerning probable cause and reasonable suspicion are legal conclusions that this Court reviews de novo. *United States v. Washington*, 455 F.3d 824, 826 (8th Cir. 2006); *Ornelas v. United States*, 517 U.S. 690, 699 (1996).

<u>Traffic Stop</u>

Moua argues Dep. Hansen did not have reasonable suspicion to stop the vehicle she was driving based on his claim he thought Moua was impaired. He also had no basis to stop the vehicle for failing to display registration under the circumstances of this case. Once stopped, Dep. Hansen almost immediately determined the vehicle did have a Wisconsin registration tab in the rear window. He had no basis to extend this traffic stop. Dep. Hansen then manufactured a

17

reason to search the vehicle knowing the initial stop was sketchy at best. The Magistrate Judge found the deputy's testimony lacking in credibility and the District Court should have deferred to the Magistrate's findings.

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const., amend. IV. A traffic stop constitutes a seizure under the Fourth Amendment and must be supported by either reasonable suspicion or probable cause. *United States v. Hollins*, 685 F.3d 703, 706 (8th Cir. 2012). In determining whether reasonable suspicion exists, the court "looks at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744 (2002); *quoting United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690 (1981).

As the Magistrate Judge pointed out in the R & R, in forming a particularized and objective basis, officers are allowed "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Jones*, 606 F.3d 964, 966 (8th Cir. 2010); *quoting Cortez*, 449 U.S. at 418. In determining whether the officers acted reasonably in such

Appellate Case: 24-2774    Page: 18    Date Filed: 10/09/2024 Entry ID: 5444690

circumstances, due weight must be given, not to [his] inchoate and unparticularized suspicion or "hunch," but to specific reasonable inferences which he is entitled to draw from the facts in light of his experience. *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868 (1968).

Eighth Circuit caselaw is clear that "any traffic violation, no matter how minor, is sufficient to provide an officer with probable cause." *United States v. Foster*, 15 F.4th 874, 877 (8th Cir. 2021); *quoting United States v. Hanel*, 993 F.3d 540, 543 (8th Cir. 2021). No traffic offenses took place in the instant matter. Dep. Hansen had nothing more than a hunch of possible criminal activity based on conduct that is considered totally reasonable for the circumstances. Further, any question about the registration was dispelled as soon as he approached the vehicle and observed the tab in the reads window.

Dep. Hansen first claimed he stopped the vehicle Moua was driving because he felt the driver was impaired. The record does not support a finding of impairment. Testimony from the suppression hearing established Dep. Hansen observed Moua while she was at a gas station getting fuel. He testified he observed Moua appear unsteady as she walked around the vehicle and she awkwardly moved her vehicle around the pumps. The weather on the night in question was cold with snow and ice on the ground.

Appellate Case: 24-2774    Page: 19    Date Filed: 10/09/2024 Entry ID: 5444690

Beyond observing Moua putting gas in a vehicle, Dep. Hansen also claimed he could not see registration tabs on the vehicle. Yet, the Government's own exhibits show the registration was visible while the vehicle was at the gas station. Dep. Hansen somehow formed a early suspicion that Moua was possibly impaired. Even though he was in close proximity to Moua's vehicle at the gas station, he did not bother to approach her or take a closer look at her vehicle. Rather, Dep. Hansen he intentionally allowed a person he claimed showed signs of impairment to drive away from the gas station in a vehicle that he claimed did not have proper registration. The Magistrate Judge recognized this as poor police work and doubted Dep. Hansen's conclusions. Assuming for argument any of this is true, then Moua asks what was more important to Dep. Hansen? Making an arrest or protecting the public? Moua argues Dep. Hansen was only concerned with justifying what he knew was a bad traffic stop.

The record does not establish Moua did anything to raise a reasonable suspicion of impairment either while she was at the gas station or by her driving conduct. Rather, her movements and driving conduct were well within expected norms, especially considering the weather conditions. One could argue Moua's driving was exemplary. The Magistrate Judge agreed in the R & R: "while wholly lawful conduct might justify the suspicion that criminal activity was afoot, the present circumstances do not give rise to such reasonable suspicion." *citing United*

*States v. Condelee*, 915 F.2d 1206, 1209 (8th Cir. 1990); *Reid v. Georgia*, 448 U.S. 438, 441, 100 S.Ct. 2752 (1980); ADD 20. This Court understands this and has stated "actions that characterize a very large category of presumably innocent travelers will not meet this standard" of probable cause. *United States v. Callison*, 2 F.4th 1128, 1132 (8th Cir. 2021); ADD 20. The instant circumstances clearly show Dep. Hansen did not have reasonable suspicion or probable cause to stop the vehicle Moua was driving for suspicion of impairment.

Dep. Hansen's own conduct in handling the traffic stop provides additional reasons to doubt the veracity of his testimony and supports the Magistrate Judge's recommendation. The encounter lasted at least an hour as Dep. Hansen struggled to decide if he had a case of impairment or some other basis to try to search the vehicle. Meanwhile, Moua was on the side of an interstate in snowy conditions with air temperatures approaching single digits. A review of the videos marked as Government exhibits at the hearing shows Dep. Hansen did not seem to understand what he was doing. Moua argues the situation should never have gotten that far.

Not only was the initial stop improper, but Dep. Hansen knew before he even spoke to Moua that the vehicle displayed a Wisconsin registration tab. If he was concerned about the registration being visible, Dep. Hansen could have resolved this at the gas station while the vehicle was parked. He certainly

21

understood the registration was not an issue as soon he approached the vehicle. The first page of Gov't Exhibit 1 from the suppression hearing shows the rear window of the vehicle at the Kwik Trip and the registration document is clearly visible in the lower left corner of the rear window. The second page of Gov't Exhibit 1 shows the vehicle turned around with the rear window directly under the lights at the gas pump. Moua argues Dep. Hansen absolutely was able to see the registration in the window at the gas station. If he wasn't sure about it, then he should have walked the short distance between vehicles and checked it out. He testified on cross examination that he is aware of Wisconsin rules on temporary tags. TR 82. Dep. Hansen can be seen acknowledging the registration in the rear window upon approaching the vehicle on Gov't Exhibit 3 and he admitted he saw it before talking to Moua. He didn't bother to look closer at the registration until later, and instead engaged with Moua at the passenger window.

If the registration was ever actually a basis for the stop, then the registration being clearly visible ended that inquiry. A seizure justified only by a police-observed traffic violation ... 'becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission' of issuing a ticket for the violation." *Rodriguez v. U.S.*, 575 U.S. 348, 350-51 (2015). Stops may last no longer than necessary to allow officers to achieve their stated purpose. *U.S. v. Jones*, 269 F.3d 919, 925 (8th Cir. 2001). Whether an officer has reasonable suspicion to expand the scope of a stop is

Appellate Case: 24-2774     Page: 22     Date Filed: 10/09/2024 Entry ID: 5444690

determined by looking at "the totality of the circumstances, in light of the officer's experience." *U.S. v. Carrate*, 122 F.3d 666, 668 (8th Cir. 1997). Moua is not arguing a nit-picky analysis of Dep. Hansen's conduct in a vacuum of legal what-ifs. The initial stop should not have happened or the deputy should have simply sent Moua on her way when he confirmed the vehicle had registration.

The analysis of the vehicle registration aspect of the case in the R & R is on point. The Magistrate Judge indicated numerous cases show that the inability of an officer to view a license plate or temporary registration can constitute reasonable suspicion for a traffic stop when such an action violates state law. ADD 18; *United States v. Bueno*, 443 F.3d 1017, 1024-25 (8th Cir. 2006)(traffic stop supported by reasonable suspicion when police stopped a vehicle that did not have a front license plate after the officers passed the vehicle while traveling the opposite directions on the highway and this could have constituted a violation of state law). The registration form in the instant matter was from Wisconsin and complied with Wisconsin law. ADD 22. However, a determination of reasonable suspicion is fact specific and requires the Government to establish the officer had "a particularized and objective basis" for suspecting Moua was breaking the law. *see Heien v. North Carolina*, 574 U.S. 54, 61, 135 S.Ct. 530, 536 (2014).

The Government's own exhibits from the suppression hearing show the registration in the rear window of the vehicle was visible when the vehicle was

23

parked at the gas station. And, the registration was visible when Dep. Hansen approached the vehicle. Moua remains puzzled as to why Dep. Hansen didn't just check the registration on the vehicle when he was parked only a few feet away from the vehicle at the gas station. That approach would not have constituted an illegal intrusion and could've cleared up the issue without risk of executed a traffic stop.

The Magistrate Judge relied heavily on the decision in *United States v. McLemore*, 887 F.3d 861, 866-67 (8th Cir. 2018). In *McLemore*, this Court analyzed a comparable traffic situation and stated "the Fourth Amendment does not permit officers to conduct a traffic stop for the sole purpose of determining that a temporary registration is valid." *McLemore*, 887 F.3d at 866-67. The *McLemore* decision adopted the ruling in *United States v. Wilson*, 205 F.3d 720 (4th Cir. 2000)(en banc)("…permitting a traffic stop under such circumstances would permit police officers to randomly stop any car with a temporary tag. The Fourth Amendment does not allow a policeman to stop a car just because it has temporary tags."). In adopting *Wilson*, this Court specifically declined to follow earlier 8th Circuit decisions that affirmed traffic stops involving temporary registration cards.

In *United States v. Mendoza*, 691 F.3d 954, 959 (8th Cir. 2012), an officer knew a paper tag in the rear window of a vehicle was not an Iowa temporary tag, but the officer could not identify the issuing state. *Mendoza*, 691 F.3d at 959. The traffic stop was upheld because the officer had particularized reasons why the suspect tag may

24

have been fraudulently created on a printer rather than issued by a governmental agency. *Id*.

In *United States v. Givens*, 763 F.3d 987, 991 (8th Cir. 2014), an officer observed a vehicle with what appeared to be a paper registration card, but the officer could not read the card because of darkness and the angle of the windshield. *Givens*, 763 F.3d at 988. This Court found the officer had reasonable suspicion to stop the vehicle and noted it was "critical" the officer could see what appeared to be a temporary paper registration card in the rear window, but did not know whether the paper was in fact a registration card. *Givens*, at 990-91. This Court in *McLemore* set aside the decisions in both *Mendoza* and *Givens* to follow the holding of the 4th Circuit in *Wilson*. cf. *McLemore*, 887 F.3d at 867.

Moua argues the District Court erred by giving more weight to the holdings in *Mendoza* and *Givens* to reject the R & R. *see* Memorandum Opinion, ADD 33-34. The District Court also gave undue credibility to Dep. Hansen's testimony. In both instances, the District Court Judge was incorrect. The District Court stated the traffic stop was permissible first because Dep. Hansen was motivated by a concern the vehicle was entirely unregistered. ADD 34. The problem with this conclusion is the registration card was clearly visible in the rear window of the vehicle as shown in the Government's hearing exhibits as the vehicle was parked at the gas station. The Magistrate Judge, who observed the testimony and saw the exhibits

25

contemporaneously with the testimony, did not believe Dep. Hansen could not see it. And, it was established Dep. Hansen recognized the registration card was in the rear window as he approached the vehicle.

The District Court then stated that even if the traffic stop fell under the *Wilson/McLemore* area of caselaw, the stop was reasonable because Dep. Hansen had a concern the registration was not placed properly in the rear window rather than in the license plate bracket. ADD 34. The hearing testimony does not bear this out as a basis for the stop and this was in error. Dep. Hansen testified he was generally aware of how Wisconsin handles temporary registration even if he didn't know the Wisconsin DOT website clearly spells out the requirements for temporary registration. *see* TR 82. Ultimately, Dep. Hansen's testimony that he could not see the registration card in the window is not believable. The Magistrate Judge said exactly this in the R & R. ADD 23.

Moua's arguments about extending the stop and the lawfulness of the subsequent search should not be an issue because a finding in her favor on the stop itself makes the search arguments moot. The evidence obtained in the search and any statements she made in the arrest or after her arrest must be suppressed.

At trial, the evidence against Moua centered on the methamphetamine found in the vehicle. She was not charged with conspiracy and no other evidence at trial would have been sufficient on its own to convict her of possession with intent

to distribute. Her motion to suppress was truly dispositive. She argues affirming this traffic stop under these circumstances would render the Fourth Amendment and the prior decisions of this Court meaningless.

## CONCLUSION

Shue Moua asks the Court to reverse the District Court ruling denying her motion to suppress and to vacate her conviction.

Law Office of Robert A. Lengeling, PLLC

Date: __October 4, 2024___          By ___*s/ Robert A. Lengeling*_____
                                    Robert A. Lengeling, #304165
                                    310 Fourth Ave S, Suite 1050
                                    Minneapolis, Minnesota 55415
                                    (612) 963-1555 / (612) 333-8003 fax
                                    robert@lengelinglaw.com
                                    ATTORNEY FOR APPELLANT

Appellate Case: 24-2774   Page: 27   Date Filed: 10/09/2024 Entry ID: 5444690

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32 (a) (7)(B) because this brief contains 6,123 words, including the parts of the brief exempted by Fed. R. App. P. 32 (a)(7)(B)(iii).

The Appellant's Brief complies with the typeface requirements of Fed. R. App. P. 32 (a)(5) and the type style requirements of Fed. R. App. P. 32 (a)(6) because this brief has been prepared in a proportionally spaced typeface using Apple Pages in Baskerville, 14 point font.

The Appellant's Brief and Addendum have been scanned for viruses and Counsel is not aware of viruses in either document.

Date:____October 9, 2024_____          _____*s/ Robert A. Lengeling*_____


## CERTIFICATE OF SERVICE

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure and the Local Rule 25A (a), I hereby certify that on October 9, 2024 I filed a copy of the foregoing brief with the 8th Circuit Clerk of Court through the Court's cm/ecf system, which will act as service of electronic copies on all registered counsel. The Appellant's Addendum was filed on October 4, 2024 and accepted for filing.

Date:____October 9, 2024_____          _____*s/ Robert A. Lengeling*_____

28